In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-04-502 CV


____________________



IN THE INTEREST OF T.J.R. and S.R.






On Appeal from the 1st District Court


Newton County, Texas


Trial Cause No. 11680






MEMORANDUM OPINION


 This case involves the termination of the parental rights of Elizabeth Diane Riggins
to two of her children, T.J.R. and S.R. A jury found Riggins' rights should be terminated. 
The trial court entered an order of termination from which Riggins brings this appeal. 
Riggins claims the trial court erred in terminating her parental rights because the evidence
is legally and factually insufficient to support termination. We find the evidence supports
the trial court's order and affirm. 

 A court may order involuntary termination of the parent-child relationship if the court
finds (1) a parent has committed one of a statutory list of acts or omissions, and (2)
termination is in the best interest of the child. See Tex. Fam. Code Ann. § 161.001 (Vernon
2002). The trial court's findings must be based on clear and convincing evidence. Id.; In re
B.L.D., 113 S.W.3d 340, 353-54 (Tex. 2003), cert. denied, 541 U.S. 945, 124 S.Ct. 1674, 158
L.Ed.2d 371 (2004). We must determine whether the evidence is such that a factfinder could
reasonably form a firm belief or conviction about the truth of the matter on which the State
bears the burden of proof. See In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002); In re C.H., 89
S.W.3d 17, 25 (Tex. 2002).

 When reviewing the legal sufficiency of the evidence, an appellate court looks at all
the evidence in the light most favorable to the finding. In re J.F.C., 96 S.W.3d at 266. In
the "clear and convincing" context, this means we must assume that the factfinder resolved
disputed facts in favor of the finding, if a reasonable factfinder could do so. Id. We must
disregard all evidence that a reasonable factfinder could have disbelieved or found incredible,
but undisputed facts cannot be disregarded. Id.

 When reviewing the factual sufficiency of the evidence, we must give due
consideration to any evidence the factfinder could reasonably have found to be clear and
convincing. Id. The evidence is factually insufficient if, "in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor of the finding
is so significant that a factfinder could not reasonably have formed a firm belief or
conviction." Id.

 The trial court found that Riggins:

 7.2.1. knowingly placed or knowingly allowed the children to remain
in conditions or surroundings which endanger the physical or
emotional well-being of the children; and


 7.2.2. engaged in conduct or knowingly placed the children with
persons who engaged in conduct which endangers the physical
or emotional well-being of the children.


See Tex. Fam. Code Ann. §§ 161.001(1)(D), (E) (Vernon 2002). The trial court further
found termination is in the children's best interest. See Tex. Fam. Code Ann. § 161.001(2)
(Vernon 2002). Riggins challenges the evidentiary support for both the endangerment and
best interest findings. 

 The referral received by the Texas Department of Family and Protective Services
(Department) in April 2003, alleged neglectful supervision and emotional abuse of the boys
by Riggins and physical abuse by Marvin Faircloth, a man Riggins and the boys were living
with at that time. (1) Riggins argues the testimony established she was not aware of the abuse
of the children by Faircloth and that she left him after determining he committed the abuse.
Riggins fails to address much of the evidence regarding her own conduct. In fact, the only
evidence Riggins acknowledges in her brief is that she forgot to do a homework assignment
with T.J.R., S.R. claimed Riggins spanked him during one visitation, and T.J.R. had a bruise
on his leg from being hit by his older brother. (2) Our review of the record reveals other
evidence that supports the jury's verdict.

Janet Carriger


 On April 21, 2003, CPS received an intake report through the State 1-800 hotline
alleging neglectful supervision and emotional abuse on the part Riggins, and physical abuse
on the part of Faircloth. At that time, Riggins, T.J.R., aged 5, and S.R., aged 4, were living
with Faircloth. (3) A caseworker for CPS, Janet Carriger, went to the children's school in
Kirbyville and was told Riggins had reported the boys absent because they were going to see
a sick relative. Carriger went to the home and no one was there. She called Faircloth who
said he did not know where they were and that Riggins had gone to see a sick relative. 
Carriger subsequently learned the children were in Corrigan with Faircloth's relatives. 
Carriger asked the Sheriff's Department in Corrigan to conduct a welfare check. Carriger
received confirmation from the Sheriff's Department that Riggins and the children were
staying at the home of Faircloth's sister. Carriger met with Riggins and the boys at the CPS
office in Livingston. 

 Carriger questioned Riggins about marks on T.J.R.'s face. Riggins thought he had
either fallen on or been hit by a shovel. Carriger discussed with Riggins that the marks
looked like finger marks but Riggins claimed she did not know how the marks could have
gotten there or who could have done it. Carriger asked Riggins why she left home. Riggins
said she was having problems with Faircloth's daughter, who had been staying in the home,
and denied the marks had any connection with the physical abuse of T.J.R. Carriger asked
if Faircloth may have done it, but Riggins did not believe so. Carriger advised Riggins it
appeared T.J.R. was the subject of physical abuse and asked her to voluntarily place him
outside the home, pending an investigation. Riggins said she did not have anyone to keep
the boys. (4) 

 Carriger asked T.J.R. about the marks on his face. T.J.R. said Faircloth slapped him
with both hands on both sides of his face. Carriger saw red marks that appeared to be hand
prints, and there were bruised places behind his ears. At that time, the injuries were three
days old. T.J.R. said Riggins was present, that he cried because it hurt, and that his mother
told him to go to bed. Riggins did not seek medical attention for T.J.R. after the alleged
incident. Carriger testified Riggins did not appear concerned about the marks on T.J.R.'s
face, and continued to say she thought he had an accident with a shovel. 

 Carriger checked Faircloth's criminal history and found he had served a ten-year
sentence in prison for the attempted murder of his wife. Faircloth was released
approximately four months before this incident. Riggins told Carriger that she knew he was
released from prison, but did not know why he was serving time. 

Barbara Collins


 Barbara Collins is a CPS Supervisor and was in charge of this case for its duration. 
On May 19, 2003, there was a meeting to discuss the Department's expectations and the Plan
of Service. Present were Collins, Janet Carriger, Riggins, Riggins' attorney, and Faircloth. 
Collins emphasized to Riggins and Faircloth that their participation was very important and
it was important they abide by the Plan of Service. Collins was concerned that no one was
accepting responsibility for the abuse. Collins saw no remorse in Riggins, she did not take
responsibility or apologize. Collins said Riggins remained in denial that she had any fault
or responsibility for the abuse for approximately one year, until Faircloth admitted striking
T.J.R. Collins explained CPS is under a statutory mandate to try to effect family
reunification within one year and in some circumstances can seek a six-month extension. 
In this case, CPS applied for and received an extension "to make sure that we had done
everything possible to ensure that the kids go back to Ms. Riggins." On May 19, 2003, that
was the goal and it still was when the extension was requested. At some point after that,
Collins realized Riggins was never going to be able to provide a safe and suitable home. She
then informed Riggins that CPS was changing its recommendation and seeking termination
of her parental rights. The original petition and the temporary orders warn that parental
rights could be curtailed or terminated if the parent fails to provide a safe and suitable home
for the children and comply with the Plan of Service. Riggins appeared in court at a review
hearing on May 7 and at permanency planning hearings. Riggins was also warned at those
hearings. Collins testified that Riggins had not demonstrated parenting techniques to provide
a safe environment. Collins recommended Riggins' rights be terminated. Collins met with
Riggins approximately six or seven times. 

Judy Biscamp, Guardian Ad Litem


 Judy Biscamp is a Court-Appointed Special Advocate, serving as guardian ad litem
for the children. She was assigned the case in May of 2003. When Biscamp first met the
boys, S.R. was four and a half years of age and not very verbal. Biscamp was present at a
visit between Riggins and the boys and heard T.J.R. claim his mother hit him "yesterday." 
Riggins denied hitting T.J.R. The next visit was cancelled because Riggins was going boat
riding and jet skiing. At that time, Riggins was allotted two visits per month. Riggins failed
to appear for a visit scheduled for September 12, saying she had forgotten the visit. T.J.R.
was very upset and according to his first grade teacher began "really misbehaving" and
"stood in front of the class and told the teacher and the classroom that he hated his real mom,
she missed her visit, and he seemed very traumatized." T.J.R. has also said he loved his
mother. 

 Biscamp visited the boys at the foster parent, Diane Vallery's, home in December. 
T.J.R. told Biscamp he had gotten mad and screamed at his mother that he hated her, and she
slapped him. He said, "'Please make her stop being mean to me. I don't want to go at
Christmas.'" T.J.R. told Biscamp that on a different occasion he had been hit in the nose by
his mother and that it bled. There was no other evidence to support T.J.R.'s claims that his
mother slapped him. 

 S.R. told Biscamp his mother hit him on the leg during the last visit. Biscamp spoke
with the teacher at school and she stated, "he had cried about this and told the class that his
real mom had hit him on the leg. And he raised his pants leg, and then showed me how he
was hit." 

 On December 2, T.J.R. told Biscamp that "he had kicked Marvin's dog, but Marvin
sent him to his room." According to T.J.R, Riggins brought the boys to Faircloth's house. 
Riggins was still seeing Faircloth and on one occasion they came to a visit together. In
January, Riggins told Biscamp "that Mr. Faircloth wanted to take it slow and that she did not
want CPS to talk to Mr. Faircloth because she was afraid that they would run him off." 
Riggins did not acknowledge until March that she believed Faircloth had struck T.J.R. 
Biscamp agreed that Riggins was still in denial. Biscamp was aware that Riggins had told
the boys that Faircloth abused or hit her. 

 Riggins had the boys for an extended visit from December 22 until December 27,
2003, and again from December 30, 2003, until January 6, 2004. When Biscamp went to
visit, T.J.R. showed her a deep bruise on his leg and said his older brother (5) had hit him, put
soap in his mouth because he said a bad word, and got soap in his eyes. Biscamp asked
where Riggins was and T.J.R. said she was in her room, playing on the computer. T.J.R.'s
visit with Riggins ended January 6, and Biscamp's visit with T.J.R. occurred on January 13.
The bruise on T.J.R.'s leg was still painful to the touch; Biscamp took a picture of it.

 On January 19, Biscamp went to visit Riggins; she was living with her father at the
time. Biscamp went to see how the boys were doing on an unsupervised visit over the
weekend. The boys showed Biscamp Riggins' bedroom, which had computers in it. From
Riggins' bedroom, one could not hear the television so Biscamp thought Riggins may not
have heard the older brother hitting T.J.R. Biscamp agreed the boys were known to fight a
lot and Riggins was aware of it. 

 Biscamp had a supervised visit February 27 with S.R. and Riggins. T.J.R. had been
taken to Buckner Children and Family Services for assessment. The visits were no longer
unsupervised due to a pending investigation resulting from the Christmas visit. 

 A supervised visit was conducted in the CPS offices in March 2004. The next day, 
Vallery was questioned by Biscamp about a song she heard T.J.R. singing the day before,
which he learned during the supervised visit. T.J.R. said they were listening to it on the radio
and his mother began singing it. Vallery was also called to school because T.J.R. was
singing the song there. It contained expletives and a racial slur. 

 On March 19, Riggins told Biscamp and Vallery that Faircloth admitted to hitting
T.J.R. Upon leaving, Biscamp told S.R. to hug his mother bye but S.R. walked to Vallery
and Biscamp and said, "'I want ya'll.'" Biscamp met with the children on September 28,
2004. At that meeting, Biscamp asked T.J.R. if he wanted to go home and T.J.R. said the
judge would not let him. Biscamp asked, "[W]hat if the judge lets you?" T.J.R. said, "'Only
if they can make her not hit me anymore,' and he said, 'I don't want my real mom to hit me
anymore. She is nice now.'" 

 A report from May 19, 2004, noted that T.J.R. started to regress in school. Biscamp
noted his behavior "'has become bizarre. He began growling and licking himself and others,
and making animal noises. Since [T.J.R's] behavior is so bizarre, the foster mother has had
to separate him from the other children, both in sleeping arrangements and in the living
area.'" According to Biscamp, the regressive behavior escalated after the first unsupervised
visit but after the Christmas and New Year's visit, "it really escalated." She testified "[t]he
teachers, the foster mother, everyone was commenting about his behavior." Biscamp had
heard the children received play swords at Christmas. 

 Biscamp testified on her first visit in June of 2003, she saw no signs of physical abuse. 
According to Biscamp, over the eighteen month period Riggins had approximately thirty
available visits and missed two. Biscamp testified she never noticed any interaction between
Riggins and the boys; the boys were more interested in playing with toys. However,
Biscamp said Riggins sits on the floor and plays with the boys. 

 In the eighteen months since the case began, Riggins moved six times. When the case
began, Riggins was living with Faircloth. She then lived at her father's and stayed with her
grandmother for a time. Riggins then moved in with her new boyfriend and later moved back
in with her grandmother. At the time of trial she was living with her boyfriend's sister. 

 Since the children were removed, Riggins had not had a place to call home nor held
a job. Riggins had never demonstrated any ability to support herself and the children without
help from a boyfriend or family member. Biscamp was unaware that Riggins was in any way
disabled or that there was anything that prevented her from working. To Biscamp's
knowledge, Riggins had not paid any child support since the children were removed. 
Biscamp did not believe Riggins had paid rent or been employed since Biscamp made her
acquaintance. In Biscamp's opinion, Riggins lacks the parenting skills to control the boys
and fears the older boys (6) being in the home with the younger ones because Riggins admitted
she cannot control them. Biscamp agreed with the findings of Dr. Carol Jacobs that "'[t]he
home is dysfunctional. It's difficult to expect medication alone will correct [T.J.R.'s]
problems if his personal space is violated. Being exposed to violence is the primary cause
of acting out toward others.'" To the best of her knowledge, Biscamp believed T.J.R. was
still being exposed to violence when he was with his mother. 

 At the time of trial, Biscamp had been visiting with the boys and following their
progress for eighteen months. In that time, she has been in contact with their teachers, 
grandmother, and great-grandmother as well as CPS personnel. Biscamp testified it was her
opinion the parental rights of Riggins should be terminated. 

Dr. Jacobs


 Dr. Jacobs made the following recommendations regarding T.J.R. in his report dated
October 23, 2003:

 Recommendations given include: medication and psych issues
discussed - feel his behavior change related to fears of abandonment due to
mother's behavior - feel if she continues to behave inappropriately with him
this behavior will worsen - may need to have counseling more often - biweekly
- spending time alone with mother may not be a good idea right now as his
behavior change after their meetings has caused significant school failure to
the point of discussion of placement into 'special ed' classes. He has shown
excellent work in the past on this same medication so the only explanation for
the worsening symptoms is psychological pressure from a dysfunctional
relationship with his parent. I strongly encourage decreased exposure at this
time to the parent until his behavior has stabilized. . . . 


Wendy McCaughn


 Wendy McCaughn, a caseworker for CPS, investigated a report T.J.R. and S.R. had
returned with injuries from a visitation with their mother. McCaughn interviewed the
children approximately six days from the time the boys returned. T.J.R. told her that he had
been in a fight with his brother, D.G. D.G. was thirteen at the time. T.J.R. said he had
cursed at D.G. and his brother tried to wash his mouth out with soap. T.J.R. told McCaughn
he had bitten D.G. He said he told his mother, but she did not do anything and that she was
playing on the computer. T.J.R. said he hated his mother, did not like to visit her and did not
want to go back. T.J.R. was adamant about his feelings and was very angry. T.J.R. had
bruising on his upper arms that appeared to be fingertip bruising, and a number of bruises
down the outside of his thigh. T.J.R. said the bruises were caused by D.G. McCaughn took
photographs of the still-visible bruises on T.J.R.'s thigh. T.J.R.'s bruises corroborated his
statements about what happened to him and the pattern of bruising was consistent with the
boys striking each other with sticks or swords. 

 S.R. told McCaughn that he liked to visit his mother and never got in trouble. S.R.
said T.J.R. and D.G. were fighting. S.R. said his mother sometimes spanked him and that
Faircloth would spank him, "but that was a long time ago." S.R. mentioned the incident with
the soap and said he also got soap in his mouth. 

 McCaughn interviewed Riggins about three days later and described her as "very
smug, very unemotional, very matter-of-fact and not very cooperative." McCaughn
discussed the allegations with her and stressed the seriousness of them, but her demeanor
remained the same. Riggins denied what happened and said she had no idea how any child
could be bruised, that none of her children had even touched each other. The only
explanation Riggins gave as to how an injury could have been sustained was that T.J.R. had
fallen and bumped his chin on the bed. Riggins said the children began to argue on several
occasions during the visit, but "that she had promptly told them to stop and that they had
stopped." McCaughn entered a finding of reason to believe Riggins was neglectful in her
supervision of the children. 

 McCaughn also spoke to D.G., M.G., and their father, Carl Gober. M.G. said he and
his mother spent most of their time on the computer, that T.J.R. and D.G. argued and were
fighting and that his mother would periodically turn around and scream at them to stop. 

Dawn Kiser


 Dawn Kiser, a CPS caseworker, was assigned to the case October 8, 2004. Kiser
assisted with visits in the Woodville office, observed the boys in the foster home with
Vallery, and did the follow-up visit after they were placed in the new foster home. Kiser was
present at a meeting on November 5, 2003, with T.J.R., S.R. and Diane Vallery. At that time,
T.J.R. continued to exhibit aggressive behavior in the foster home. T.J.R. said he liked Diane
and wanted to continue staying in her home. He said his mother was mean. The boys were
with Vallery approximately one year and bonded very well with her. 

 Kiser was present at the initial removal and was with T.J.R. and S.R. while Carriger
was talking to Riggins. Kiser described S.R. as hyper and running through the office; she
spent most of her time trying to get S.R. out from under the table. S.R. would not verbalize
or talk to her. T.J.R. was obsessive about the toys and would start screaming at S.R. if he got
near them. Kiser said when it was explained to the boys they were going "someplace safe,"
they were more concerned with whether a doll was coming with them. The boys did not
appear traumatized by the removal and within seconds of leaving the parking lot T.J.R. told
Carriger, "'I love you.'" 

 When Kiser saw T.J.R. approximately two or three months later, his behavior was
very different. He knocked over a water globe and kept apologizing and said he would fix
it. T.J.R. was concerned he had broken something that was hers, which was different from
his earlier behavior when he treated everything as his. Over the next months, while Riggins'
visitation was restricted, T.J.R. was very polite and would come by and talk and hug "us."
S.R. no longer had to have his hand held, he stayed by Vallery. S.R. played appropriately
and had more social interaction. 

 When the overnight visits with Riggins started, Kiser did not have as much contact
with the boys. She visited them in the foster home and noticed they seemed more concerned
about the appearance of their toys and not as destructive. Their room always looked nice and
their beds were made. The boys seemed very happy and excited. They wanted Kiser to see
their room and new things and wanted to talk about school. They were interactive and let her
read them a book. Before, Kiser did not believe S.R. would have quieted down to read a
book. The boys were happy in the foster home and told Kiser they liked staying with "Mama
Diane." 

Diane Vallery


 Diane Vallery was the foster mother for T.J.R. and S.R. for fifteen months. They were
placed with her immediately after the initial removal. At the time, S.R. was "a runner," she
had to hold onto his hand or he would run. When Vallery entered him in Woodville School,
he had attended that school before and was known as a runner. Within approximately two
weeks, S.R. quit running and Vallery did not have to hold his hand. S.R. was four and was
not potty-trained "at all;" he was still wearing diapers or pull-ups all the time. After
approximately one month, S.R. improved. At first, the boys liked to urinate on the floor. 
Vallery described T.J.R. as "a very angry child" who "would cry for, like eight hours, just
scream and yell, didn't want to be around anyone. . . ." T.J.R. "would hurt his brother quite
often, would bite him, like twenty times." After approximately three weeks, T.J.R. quit
biting and crying. 

 Vallery noticed a blue mark on T.J.R.'s arm and asked about it. T.J.R. said he had a
"BB" in his arm and his mother shot it in him. T.J.R told Biscamp that Riggins shot him,
"but it was ricocheted." Vallery said "if you rubbed his arm, you could actually feel it." 
T.J.R. said his mother put a band-aid on when it happened and he never went to the doctor. 
According to T.J.R., it was a three-year-old injury. Biscamp made arrangements and a doctor
removed it. It was not a BB, but the end of a pellet. Riggins was informed the pellet was
going to be removed and did not attend. She never inquired about it afterward. Riggins
never offered Biscamp any explanation as to why she failed to take care of the problem. 

 During the summer, the boys visited with their mother for several hours "a couple
times a month" at CPS in Jasper or Woodville. Vallery took the children to the CPS offices
for the visits. On September 12, a visit was scheduled but Riggins had forgotten. She called
and left a message on Vallery's answering machine "saying that she had forgotten the visit"
so it was rescheduled. Vallery said that was when T.J.R. started to decline. Vallery testified
that "[f]rom that time on, [T.J.R.] . . . never was the same. He was very angry, started going
back to like when he first came into my house. He had a cold, so I took him to a doctor that
had seen him before, and he told the doctor that he was mad at his mother." Vallery testified
she worked with T.J.R. all summer and when he started first grade he was at the top of his
class. After the visit when Riggins failed to show up, T.J.R. digressed and within a month,
"they were talking about putting him in special ed. . . ." Vallery said T.J.R.'s behavior
started changing since the visit Riggins missed and he got "worse and worse." Riggins
missed another visit on February 27, 2004, and S.R. was very upset (T.J.R. was at Buckner). 
 When the boys returned from visits with their mother, they would "cuss" and have to
be corrected. They would stop and it would start again after another visit. Vallery described
Riggins' demeanor when telling the children good-bye as "She would just hand them over.
. . . It was just like me taking my dog to the groomer and dropping it off. " There were five
unsupervised visits. Riggins was granted telephone visitation twice a month and it was in
effect from the beginning of the case, in May 2003. The calls were scheduled to be at 6:00
p.m. on the fifth and twentieth each month. Vallery disagreed with Riggins' testimony that
she called her children over twenty-eight times while they were in foster case at Vallery's
house. According to Vallery, the first time she called was January 20, 2004. She called
again February 5 and March 5, three times altogether. At first the children anticipated the
calls but got angry when there was no call. Toward the end of the year, Vallery would not
tell them their mother was going to call. Vallery told Riggins' caseworker that she was not
calling. A Permanency Planning meeting was held on January 16 and Riggins was asked
why she had not called. Riggins then called on the twentieth. Riggins had not called since
March. Riggins called Vallery but talked about Faircloth and herself; she read Vallery the
psychological profile the therapist had done on her. Riggins disagreed with the profile. 
Later in the year, Riggins told Vallery that Faircloth tried to hit her. Riggins called several
times asking if Vallery was receiving the boys' social security money. It was Riggins' belief
the money would be saved and when she got the boys back she would receive a lump sum. 
Riggins called at unscheduled and inappropriate times, such as 6:02 a.m., 10:00 and 11:00
p.m., and when the boys were in school, with no expectation of talking to the children. 
Riggins would call Vallery when the children were with Riggins. Vallery put a block on her
phone and that reduced the calls. When Riggins called on March 5, she spoke to S.R. (T.J.R.
was at Buckner for evaluation). They spoke for approximately five minutes. Vallery
overheard S.R. say, "'He hit you? He hit you? Call the police and give him a ticket. He
took your car?' And then he said, 'You have a new boyfriend?'" S.R. hung up and said,
"'Marvin hit my mom and took her car. But it's going to be okay, because she's got a new
boyfriend and she's going to get married.'" Vallery asked Riggins why she was having such
a detailed conversation about her personal problems with S.R. and Riggins said she did not
keep anything from her boys and tells them everything. Vallery called the caseworker and
asked him to speak with Riggins about appropriate conversation with the children. 

 In November 2003, the boys were with Riggins for six days at Thanksgiving. T.J.R.
told Vallery that he had gotten in trouble for kicking Faircloth's dog and Faircloth sent him
to his room. He also told Vallery that he told his mother that he hated her and she slapped
him in the face. T.J.R. was upset because she did not apologize. T.J.R. had a homework
assignment to be done on a poster board over the Thanksgiving holiday. Vallery gave it to
Riggins. When the boys returned, Vallery asked where the poster was and Riggins said she
forgot it and would take it to school. Vallery assumed it was finished but Riggins brought
it to the school and it was blank. Riggins told Biscamp that she "just forgot about it."
Riggins said Vallery gave her the poster board but did not give her any directions. Vallery
disagreed with Riggins' claim that she did not tell her what the poster board was for and
noted that Riggins had Vallery's phone number and could have called to ask if she did not
understand. Vallery asked Riggins why it was not done, and Riggins said she did not have
time to do it. Riggins did not say she did not understand the project. 

 Vallery testified that when the boys were brought back after Christmas, T.J.R. had a
huge, deep bruise which Riggins said was caused by D.G. T.J.R. also had thirty to fifty small
bruises all over his body. Riggins brought swords and different things the boys received for
Christmas. Vallery told Riggins to take the swords back; they could not play with them at
her house. Vallery felt it was inappropriate for them to have swords because "[t]hey don't
have very many boundaries, and when they do, they have anger problems. And swords just
. . . add to it." ". . . [I]t's going to start a fight." Vallery said the boys are very aggressive.
Vallery thought it was poor judgment to give them swords to play with and said she used to
work at a center for abused children that would not allow guns or swords. T.J.R. hit S.R. and
Vallery told him that they could not hit each other and needed to stop. T.J.R. asked Vallery 
if she wanted to watch them fight. Vallery said no and T.J.R. told her that his mother makes
them fight so she can watch. 

 It was Vallery's understanding that the goal for the children was reunification with
their mother within a year. It was her opinion that the children had bonded more with her
than their mother. The boys have problems, aggression and Attention Deficit Disorder.
Vallery said she loved them and missed them, they are good boys and have a good heart but
have had a rough life. It was her opinion that Riggins' rights should be terminated. 

Diane Riggins


 Diane Riggins testified after her divorce from her first husband, she worked at
Popeye's for approximately a year and a half and then at McDonald's for two months before
getting her license as a certified nurse's aide. Riggins indicated her license had expired but
not when. She testified she can no longer work as an aide due to a shoulder injury. As an
aide, she worked at Dogwood Trails Manor for eight or nine months and then worked at
Woodville Convalescent Home for eight or nine months. She then became a Corrections
Officer with the Texas Department of Corrections. Later, she went back to work at the
nursing home until February 2000. She did not work after that, her second husband was very
ill with diabetes, nor has she worked since. Her second husband, the boys' father, died at
home on August 6, 2000. The children were present. The children began acting up three or
four months after he died. They were disruptive, did not want to behave, and refused to do
anything asked of them. 

 In January of 2003, Riggins met Faircloth. Around the middle of February, she and
her children moved in with him. Riggins knew he was in prison for ten years but did not
know for what. She asked but he did not tell her. She also asked his sister but never found
out. In April, his daughter, Heather, her husband and her child moved in. Regarding the
incident on April 21, 2003, Riggins testified she did not know what happened, she went to
the store and when she returned "the house was in total chaos." According to Riggins, T.J.R.
was in bed, awake, visibly upset and shaken, but would not tell her what was wrong. She
turned on the light and he had marks on his face. Riggins testified she told Carriger about
the shovel incident and that she did not know how the marks on his face were caused. 
Faircloth would not talk to her but she did not suspect he hit T.J.R. The next morning, they
packed their clothes and left. Riggins later asked Faircloth if he hit T.J.R. and he said no. 
Riggins testified she left because she knew something happened, but did not know who did
it. She did not report the incident to law enforcement. According to her, she was more
concerned with removing them from that environment. 

 Riggins said she did not leave that night because it was too late. Her grandmother has
hearing problems and it would have been difficult to rouse her. Riggins did not have any
idea where her dad was. She left the house at 7:00 a.m. the next morning, after Faircloth
went to work and without telling him where she was going. She went to her grandmother's
house first and then went to Faircloth's sister. She stayed there two days. She took the
children out of school for three or four days. Riggins said she was in the process of moving
the children back to Woodville, to stay with her grandmother. CPS came April 24 and took
the children. She did not see them again until June. Riggins returned to Faircloth's house
and stayed there until August. Riggins said she would not have been there if she had the
children, but wanted them back. At Christmas, Riggins saw Faircloth at his sister's house,
which is right next door. She went because he bought the children Christmas presents. 
Riggins testified she realized Faircloth struck T.J.R. when he told her, in February 2004. 
While Riggins was living with Faircloth, she was not working and he was supporting her. 
Riggins said she did not need his support; she could move in with her family and find a job. 
Since February of 2000, Riggins has lived with Faircloth, her father, her grandmother, and
her current fiancé. At the time of trial, she testified she has lived with her new fiancé for
about nine months. Riggins met her new fiancé around January 2004 and moved in with him
in February. Riggins testified she does not rely on men; her family is her other means of
support and care. Riggins testified that when she had the children, she received about $400
a month in food stamps and $531 in social security. At the time of trial she was not getting
$931 a month. 

 Riggins agreed the boys have discipline problems and fight a lot. The boys received
plastic swords as Christmas gifts but Riggins could not recall from whom. Riggins said they
did not hit each other with the swords in front of her. Riggins claimed she was with the
children at all times during visitation. She admitted to stepping into the bathroom one time
and, when she returned, all four boys were fighting and the two little boys ended up pretty
bruised. According to Riggins, the boys were not in possession of the swords when they
were not in her sight. Her older children are around the younger boys when her ex-husband
lets her have them. 

 Riggins denied ever striking T.J.R. in the face or giving him a bloody nose. She had
problems with the boys lying to her. Riggins denied not being able to care for her older boys.
She said they lived with their father because she was working a minimum wage job and they
needed their father. The divorce decree granted Riggins custody, but she returned them to
their father. 

 Riggins was asked what her plans were if the jury returned the children. She said,
"Love them, put them in a stable environment." Riggins said the environment she was in
currently was stable, and had been stable for nine months. She was living in a two-bedroom
house with her fiancé and getting married in February of 2005. He earned between $1,100
to $1,500 every two weeks. She now has a car that her fiancé bought for her. He could put
the children on his insurance if they live with him a certain length of time. 

 According to Riggins, when the children would leave after visitation, they would get
upset and wanted to go home with her. Riggins said it was possible the boys' problems were
caused by the medication. Riggins identified the cause as their wanting to be with her, being
placed in various foster homes, seeing different doctors and psychologists, and being on
different medications. Riggins believed Dr. Jacobs "has a prejudice" against her. Riggins
did not know what portion of the children's problems were attributable to her. 

 Dr. Bordages' psychological report attributed Riggins' anxiety to the situation and
involvement with child welfare authorities, which was expected to subside as the situation
was resolved. Further, he said, "'Ms. Riggins appears fully capable of providing appropriate
care for her children and current evaluation does not reveal any cause for concern about
continued placement of her children in the home.'" The report also stated, 

 Maladaptive behavior is most likely based on her poor judgment, sense of
entitlement and maladaptive value system. . . . Ms. Riggins is in need of
counseling to assist her in developing empathy with others and to help her
recognize how her behavior impacts the people around her and could
contribute to situations such as the one which led to the involvement of child
welfare authorities. . . . Severe anger may erupt when her self-image or self-esteem is challenged. 


According to Riggins, anger management classes were never set up. She testified she does
not need them and told CPS she did not.

 Faircloth attended one psych examination and one counseling session. Riggins was
trying to reconcile with Faircloth but that did not work out. In August, 2003, she left and
moved in with her father. She stayed there until February 2004, when she went and stayed
with her fiancé. Riggins said she attended all of the counseling sessions until the end of
February. She quit going because she lost her transportation. She attended all her parenting
classes. Riggins testified she talked to the children by telephone twenty-eight times over
eighteen months. Riggins went to the Workforce Center and turned in an estimated thirty or
forty job applications. While she did not have any success through the center, she was still
looking. When asked what changes she might need to make before the children could be
returned, Riggins said, "Getting them back in the home so I can have them on a full-time
basis." 

 Riggins' trial counsel raised the possibility that the behavioral problems of T.J.R. and
S.R. were attributable to other causes. Over the eighteen months CPS was involved in this
case, T.J.R. had been prescribed Concerta, Strattera, Lexapro, Trileptal, Clonidine, Catapres,
Zyprexa and Paxil. 

 On April 24, 2003, the children were placed in foster care with Vallery. On February
10, 2004, T.J.R. was moved to Buckner for assessment of his behavioral problems. T.J.R.
returned to Vallery's home on March 26, 2004. T.J.R.'s level of care rating went to
specialized. S.R.'s level of care rating was raised to moderate. As a result, it was necessary
to move the boys to a therapeutic foster home that was licensed for moderate to specialized
care. On June 7, 2004, the boys were moved to such a home. Thus, T.J.R. was moved five
times in the past year and a half while S.R. had been moved four times. The boys had been
in three homes and had been together except for the six weeks T.J.R. spent at Buckner. 
T.J.R. had been in four schools and S.R. had been in three. 

Marietta Stewart


 Marietta Stewart was T.J.R.'s kindergarten teacher in Woodville ISD for the 2002-2003 school year. Stewart testified T.J.R. had severe behavior problems, outbursts, and
temper tantrums. Throughout the day, T.J.R. would fall back, hitting his head on the floor. 
Stewart referred the matter to the counselor because he was so out of control and she was
concerned he would hurt himself. T.J.R. had the ability to learn facts, but could not put them
together, so he stayed behind developmentally. T.J.R. demonstrated oppositional defiance. 


Gloria Burkes 


 Gloria Burkes teaches a preschool class for children with disabilities and taught S.R.
for the 2002-2003 and 2003-2004 school years. S.R. was three the first year. He had speech
delays, behavioral problems, tantrums and was defiant. S.R. would cry for an extended time
if he became upset and fixate on an activity. 

 Medical records from S.R.'s pediatrician indicated that in August of 2003, S.R. had
never been toilet-trained and showed no interest in it. Burkes testified that S.R. was not
toilet-trained and still wore diapers. Medical records from March 2004 state, "There is a
report that biological mother uses diapers rather than pull-ups." By May 2004, S.R. was
toilet-trained. Burkes testified S.R. is now toilet-trained and at the end of the 2004 school
year was wearing underwear. 

 In January 2004, S.R. was assessed with "ADHD," "dissatisfaction with school
environment," and "Parent-child problems." Medical records from March 2004 indicated
"return to poor family structure with return of soiling habits, is emotional. There is a report
of older teen siblings being physically abusive to other younger sibling so this is probably
learned behavior." The medical records from May 2004, note concerns S.R. was "not
comprehending things and hurting other kids, and having 'Terrible problems at home. Has
increased violence and whining' for up to 30 minutes, 'alternating with growling.'" Burkes
did not recall the growling or him hurting other children, but did remember the crying. In
January 2004, doctors' reports indicated S.R. "'has been whining and somewhat acting out. 
Has continued visitations with his mother and has 'some acting out and is rowdy at home.'"
After S.R. was placed in foster care with Diane Vallery, he returned to Burkes' class. S.R.
appeared happier, laughed more, and did not cry as much. He was more compliant, had
fewer tantrums, did not fixate on things, and his language skills were improving. Burkes said
after S.R. was placed in foster care, his behavioral problems were not "on the same level as
before" and that he appeared happier, less defiant, and did not cry extensively. She would
say his behavior improved. He was beginning to be toilet-trained and had made
developmental gains. Because of his progress, he was put in pre-kindergarten half of the day.
Burkes acknowledged some of the improvement was because of his age. Burkes believed
S.R. was on medication, but did not recall what. 

 During the second time S.R. was in Burkes' class, he was having visits with his
mother. The problem behavior that Burkes had seen the year before seemed to recur when
S.R. had a visit with Riggins. S.R. seemed more irritable and defiant. It appeared there was
a correlation between S.R.'s regressive behavior and visits with Riggins. 

Connie Robinson


 Connie Robinson, the Pre-Kindergarten teacher at Woodville ISD, had S.R. in class
from lunchtime until the end of the day during the 2003-2004 school year. Robinson had a
meeting with Riggins in the Spring of 2004, at Riggins' request. Riggins was seeing a
counselor at that time and the counselor advised Riggins to check on the boys' progress. It
was the only meeting of which Robinson was aware; to her knowledge Riggins had never
been there before. When S.R. first began attending Robinson's class, he was compliant,
followed the structure of the class and did the same work as the other children. He did not
have any behavioral problems. S.R.'s behavior regressed after visits with his mother. He
became noncompliant, refused to work, and had temper tantrums. S.R. would "go berserk"
if he received a warning about his behavior. S.R.'s behavior would regress from even a
phone call from his mother. Depending on the type of contact, it would take from one day
to several weeks for S.R. to return to good behavior. 

Jackie Hubbard


 Jackie Hubbard, Program Director for CPS, reviewed the log of contact narratives and
the investigation summaries and reports of this case. Hubbard also reviewed psychological
reports on the mother and the children. Hubbard testified that if termination occurs, for
children of the age of these two, the hope and expectation would be for adoption. The
second option would be to transfer managing conservatorship to a family willing to accept
that permanent responsibility. The last option would be for the children to grow up in the
system. Without termination, there could be no adoption. Hubbard did not believe return
to the mother was an option. Adoption was the best option for the children and the best time
for that to happen was "as soon as possible." Hubbard's opinion was that termination was
in the best interest of the children. 

Discussion


 Riggins argues the evidence does not support the jury's finding of endangerment. The
record reveals that T.J.R. was physically abused by Faircloth. Riggins failed to seek proper
medical care for the child's injuries. Even after Faircloth admittedly confessed to the abuse,
Riggins continued to spend time with him and even brought the boys to his home. The boys
made repeated claims of being hit or slapped by Riggins, which continued even after their
removal, during periodic visits. There was evidence that Riggins failed to supervise the
children to prevent injury from their older brother. During the period of 18 months when the
State was working toward reunification of the boys with their mother, Riggins' visits with
the children resulted in their behavior regressing and caused emotional trauma. There was
no contrary evidence. Accordingly, we find the evidence is such that a factfinder could
reasonably form a firm belief or conviction that Riggins engaged in conduct or knowingly
placed the children with persons who engaged in conduct which endangered their physical
or emotional well-being. See In re J.F.C., 96 S.W.3d at 265-66; In re C.H., 89 S.W.3d at 25;
and Tex. Fam. Code Ann. § 161.001(1) (E).

 Riggins also contends the evidence is insufficient to support the jury's determination
that termination is in the best interests of the children. See Tex. Fam. Code Ann. §
161.001(2). 

 An extended number of factors have been considered by the courts in
ascertaining the best interest of the child. Included among these are the
following: (A) the desires of the child; (B) the emotional and physical needs
of the child now and in the future; (C) the emotional and physical danger to the
child now and in the future; (D) the parental abilities of the individuals seeking
custody; (E) the programs available to assist these individuals to promote the
best interest of the child; (F) the plans for the child by these individuals or by
the agency seeking custody; (G) the stability of the home or proposed
placement; (H) the acts or omissions of the parent which may indicate that the
existing parent-child relationship is not a proper one; and (I) any excuse for the
acts or omissions of the parent. This listing is by no means exhaustive, but
does indicate a number of considerations which either have been or would
appear to be pertinent.


Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976) (footnotes omitted). The testimony
set forth above reveals only evidence indicating termination is in the children's best interest. 
The consistent testimony reflects that T.J.R. and S.R. are happier and less troubled when they
are away from Riggins. T.J.R. has expressed he does not desire to live with his mother. The
acts and omissions of Riggins indicate her inability to pursue a proper parent-child
relationship. The plans for the children are adoption. In addressing these factors, Riggins
does not refer this court to any evidence that termination of the parent-child relationship is
not in the best interest of either T.J.R. or S.R. Therefore, we find a factfinder could
reasonably form a firm belief or conviction that it is in the best interests of T.J.R. and S.R.
that Riggins' parental rights be terminated. See In re J.F.C., 96 S.W.3d at 265-66. For these
reasons, appellant's issue is overruled.

 The judgment of the trial court is AFFIRMED.





 CHARLES KREGER

 Justice


Submitted on May 11, 2005

Opinion Delivered August 31, 2005



Before Gaultney, Kreger, and Horton, JJ.
1. The boys' father, Riggins' second husband, died in August, 2000.
2. Riggins and her first husband had two boys; following the divorce, she returned them
to his custody. 
3. At the time of trial, T.J.R. was six years, ten months old, and S.R. was two days shy
of turning six years old.
4. According to Barbara Collins, a CPS Supervisor in charge of the case, Riggins never
suggested a suitable family placement and relatives that had been approached were unwilling
to take the boys. 
5. Riggins' two older boys, by her first husband, were also visiting over the Christmas
holidays. 
6. The older boys are approximately thirteen and fourteen.